David C. Reymann (8495) (dreymann@parrbrown.com)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah  84111
Telephone:  (801) 532-7840

Attorneys for Intervenor STAT News

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JANET SCHUBERT, individually, and as personal representative on behalf of the legal heirs of Dr. William Schubert, deceased,<br><br>    Plaintiffs,<br><br>vs.<br><br>GENZYME CORPORATION, a Massachusetts corporation; SANOFI, a French company; BUSINESS ENTITIES I through X; UNIVERSITY OF UTAH HOSPITALS AND CLINICS, a Utah entity; THE UNIVERSITY OF UTAH HEALTH SCIENCES CENTER, a Utah entity; UNIVERSITY HEALTHCARE, a Utah entity; and THE STATE OF UTAH,<br><br>    Defendants. | **MOTION TO UNSEAL FOURTH AMENDED COMPLAINT (DKT. 173)**<br><br>Case No. 2:12-cv-00587<br><br>Judge Howard C. Nielson, Jr.<br><br>Magistrate Judge Evelyn J. Furse |

**TABLE OF CONTENTS**

MOTION AND RELIEF SOUGHT ............................................................................................. 1

INTRODUCTION AND BACKGROUND ................................................................................... 1

SUMMARY OF ARGUMENT ..................................................................................................... 5

ARGUMENT ................................................................................................................................. 6

   I.  THE PUBLIC HAS A PRESUMPTIVE RIGHT OF ACCESS TO DOCUMENTS FILED WITH THE COURT ................................................................................................................ 6

      A.   The Public Has a Constitutional Right of Access to Court Records ............................ 7

      B.   The Public Also Has a Common Law Right of Access to Court Records ................. 12

   II.  THE FOURTH AMENDED COMPLAINT SHOULD BE UNSEALED .......................... 13

CONCLUSION ............................................................................................................................ 15

**MOTION AND RELIEF SOUGHT**

Pursuant to DUCivR 5-3 and 7-1, Intervenor Boston Globe Life Sciences Media LLC d/b/a STAT News ("STAT News") respectfully moves to unseal Docket No. 173, Plaintiff's Fourth Amended Complaint. The basis for this motion is that the public has a constitutional and common law right of access to documents in the court file, and the parties have not made the showing necessary to overcome that presumption and justify the extraordinary remedy of sealing court records.

**INTRODUCTION AND BACKGROUND**[1]

Fabry disease is a rare genetic disorder caused by mutations in the *GLA* gene, which provides instructions for making an enzyme called alpha-galactosidase A. That enzyme is necessary for the proper functioning of lysosomes, part of a cell's recycling system. Without the proper enzyme, a person's cells cannot effectively break down a certain lipid called globotriaosylceramide. As a result, lipids build up in cells throughout the body, eventually causing organ damage and inflammation. Left untreated, Fabry disease can have serious, life-threatening effects, including progressive kidney failure, heart attack, and stroke, ultimately leading to death.[2]

Diseases that result in enzyme deficiencies are often treated with intravenous enzyme replacement therapy, artificially providing the enzyme that the body cannot produce on its own. In the United States, there is only one FDA-approved replacement therapy for Fabry disease—

---

[1] Because this case has been closed for some time and has switched assignments, STAT News offers a somewhat longer introduction below to provide the Court with context for this motion.

[2] For more general information on Fabry disease, *see* https://ghr.nlm.nih.gov/condition/fabry-disease#genes (last visited April 13, 2020).

agalsidase beta, marketed by Defendant Sanofi-Genzyme as Fabrazyme.[3]  Even though the patent on Fabrazyme has expired, the extremely high barriers to entry for manufacturing and obtaining FDA approval of an equivalent, biologically-derived treatment has meant that Genzyme has maintained a decades-long monopoly on agalsidase beta in the United States.

The Plaintiff in this case is the surviving spouse of Dr. William Schubert, who suffered from Fabry disease.  According to the Third Amended Complaint, Dr. Schubert began infusion treatments of Fabrazyme in 2005, after his initial diagnosis.  Dr. Schubert's treatment course was at the FDA-approved dosage level of 1 mg/kg body weight every two weeks.[4]

In a widely reported incident in June 2009, however, Genzyme's Massachusetts factory had to be shut down because the hamster cells it was using to produce Fabrazyme became infected with a virus called Vesivirus 2117.[5]  The contamination and shutdown led to a severe shortage of Fabrazyme for many months, bringing production to approximately 30% of normal. In light of Genzyme's monopoly on the drug in the United States, and the unavailability of treatments used in Europe that were not FDA-approved, this effectively meant that those in the United States with Fabry disease could not obtain the full dosage of medicine necessary to treat their progressive disease.  As a result, towards the end of 2009, Genzyme began rationing Fabrazyme and shipping "low doses" to be used on U.S. patients while the shortage persisted.

---

[3] Although they are listed as separate parties in this case, Sanofi-Aventis SA acquired Genzyme Corp. in 2011 for over $20 billion.  This memorandum refers to the resulting company as "Genzyme."

[4] *See* Third Amended Complaint and Jury Demand ("Third Am. Compl."), Dkt. 42, ¶¶ 20-21.

[5] *See* Third Am. Compl., Dkt. 42, ¶ 22; *see also* https://blogs.scientificamerican.com/news-blog/virus-hits-genzyme-plant-halting-pr-2009-06-17/ (last visited April 14, 2020).

Some of those doses were allegedly at levels half or below the FDA-approved dosage level of 1 mg/kg body weight.[6]

Many patients who were subject to this rationing protocol alleged that the lower dosage they were receiving was far less effective in treating their disease, and, in some cases, possibly counterproductive because it triggered anaphylactic shock.  This led to lawsuits in multiple states against Genzyme and others, including this one, in which Plaintiff alleged that the low dosage Dr. Schubert was given either failed to prevent or triggered his catastrophic health failure and death on March 6, 2010.[7]

As the docket shows, this case was actively litigated for several years.  This motion concerns only one small chapter.  On January 29, 2015, Plaintiff moved for leave to filed a Fourth Amended Complaint.  The gravamen of the amendment was to add claims sounding in fraud and misrepresentation based on alleged statements by Genzyme regarding the Fabrazyme shortage, its rationing, and the clinical effectiveness of the low doses Genzyme was shipping to patients.  These new allegations went significantly beyond the allegations in the Third Amended Complaint, which sounded largely in negligence.[8]  If true, evidence of intentional misrepresentations by Genzyme regarding the effectiveness and safety of low doses would be of immense health importance for the thousands of people in the United States suffering from Fabry disease who either received low doses in the past, or (given Genzyme's ongoing monopoly) could in the future should a shortage recur.  Similarly, all American physicians treating Fabry

---

[6] *Id*. ¶ 22; *see also* https://www.npr.org/sections/health-shots/2010/08/04/128973687/with-a-life-saving-medicine-in-short-supply-patients-want-patent-broken (last visited April 14, 2020).

[7] Third Am. Compl., Dkt. 42, ¶¶ 23-31.

[8] *See* Plaintiff's Motion for Leave to File an Amended Complaint, Dkt. 169.

disease have a fundamental need to understand the effects that low dosing had on patients so as to effectively and safely treat them, as well as future patients.

With its motion for leave to amend, Plaintiff also filed a motion to file the proposed Fourth Amended Complaint under seal.[9] Plaintiff did not attempt to justify the sealed filing beyond saying that certain allegations were derived from discovery materials designated as "Confidential Information" by Genzyme under the blanket Standard Protective Order. The motion implied that Plaintiff disagreed with the designations but was required to follow them absent further court action. The Fourth Amended Complaint was then conventionally filed with the Court at Docket No. 173.[10] The motion for leave to amend was subsequently granted, Dkt. 180, and the Fourth Amended Complaint became the operative pleading in this case. That is the document this motion seeks to unseal.

What followed was a flurry of filings centered on whether the Fourth Amended Complaint should be kept under seal. Genzyme moved for a protective order seeking to maintain the designations of information it produced in discovery under the blanket Standard Protective Order, and on which the allegations in the Fourth Amended Complaint were partly based.[11] Genzyme also filed a related motion seeking to preserve the provisional seal on the Fourth Amended Complaint, arguing that it was derived from confidential documents designated in discovery.[12] Plaintiff opposed the motion for protective order, arguing that Genzyme had

---

[9] Dkt. 170.

[10] *See also* Dkt. 171, Notice of Conventional Filing.

[11] Dkt. 174.

[12] Dkt. 177.

waived the protections of the Standard Protective Order by failing to timely move to preserve designations; and also that Genzyme had not shown good cause for its overbroad attempt to keep secret anything related to its business, including the allegations in the Fourth Amended Complaint.[13]

Briefing on the motion, however, was never completed. Shortly thereafter, this case settled and was dismissed.[14] As a result, the Court never had the opportunity to substantively address whether the Fourth Amended Complaint should remain under seal. This motion raises that issue.

## SUMMARY OF ARGUMENT

Courts do the public's business. When parties employ the courts to resolve their disputes, they are not entitled to conduct those proceedings behind closed doors. Fundamental to this bedrock principle of open government is the rule that when documents are filed with the Court (as opposed to merely being exchanged in discovery), they become subject to a strong constitutional and common law right of access by the public. That right can be overcome in only the most exceptional circumstances, and never based on sweeping assertions of "business confidentiality" unsupported by any specific articulation of overriding harm. This Court's own rule fully embrace that principle, recognizing the presumptively open nature of the court file and stating that sealing of documents is "highly discouraged" and cannot be justified by "a blanket protective order that allows a party to designate documents as sealable." DUCivR 5-3(a)(1).

---

[13] Dkt. 181.

[14] Dkt. 194.

Based on these principles, the Fourth Amended Complaint should be unsealed. Throughout the lengthy briefing on the motion for protective order, Genzyme never provided any specific explanation for why the allegations of the Fourth Amended Complaint warranted the extraordinary remedy of sealing. Instead it consistently relied on the blanket Standard Protective Order designations it had made in discovery, which this Court's rules disavow as a proper basis to seal. Weighed against these generalized assertions of business confidentiality is the interest of thousands of people in the United States who are suffering from a potentially fatal disease, and to whom it would be critical to know whatever evidence Genzyme has regarding the effectiveness—or harm—of low doses of Fabrazyme. STAT News, as a journalism organization committed to providing health and pharmaceutical information to the public, seeks that information for precisely that purpose. This Court should uphold the public's right of access and unseal the Fourth Amended Complaint.

## ARGUMENT

I. **THE PUBLIC HAS A PRESUMPTIVE RIGHT OF ACCESS TO DOCUMENTS FILED WITH THE COURT.**

Unlike ordinary discovery materials, when documents are filed with the Court, they become presumptively public and subject to a robust right of access.[15] This right is grounded both in the First Amendment and in federal common law.

---

[15] *See*, *e.g.*, *Mokhiber v. Davis,* 537 A.2d 1100, 1112 (D.C. Ct. App. 1988) ("the presumptive right of access to pleadings attaches at the time documents are filed with the court"); *Shane Grp., Inc. v. Blue Cross Blue Shield of MI*, 825 F.3d 299, 305 (6th Cir. 2016) ("Unlike information merely exchanged between the parties, '[t]he public has a strong interest in obtaining the information contained in the court record.'" (citation omitted)).

### A. The Public Has a Constitutional Right of Access to Court Records.

The United States Supreme Court has long held that the public and the press enjoy a presumptive constitutional right of access to judicial proceedings. That Court and the Utah Supreme Court have affirmed this constitutional right of access in a variety of contexts. *See*, *e.g.*, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S. Ct. 2735 (1986) ("*Press-Enterprise II*") (preliminary hearings); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S. Ct. 819 (1984) ("*Press-Enterprise I*") (criminal voir dire proceedings); *Waller v. Georgia,* 467 U.S. 39, 104 S. Ct. 2210 (1984) (applying First Amendment open courts analysis to pretrial suppression hearing); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S. Ct. 2613 (1982) (criminal trial involving child victim of rape); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S. Ct. 2814 (1980) (criminal trial); *Soc'y of Prof'l Journalists v. Bullock*, 743 P.2d 1166 (Utah 1987) (upholding First Amendment right of access to competency hearing); *Kearns-Tribune v. Lewis*, 685 P.2d 515 (Utah 1984) (preliminary hearings); *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court*, 980 P.2d 337 (Cal. 1999) (recognizing parallel constitutional right of access to civil proceedings).

This right of access has a time-honored history, rooted in the acknowledgement that the open court fosters and protects important societal values. It enhances the quality and safeguards the integrity of the fact-finding process, *Globe Newspaper Co.*, 102 S. Ct. at 2619, enhances basic fairness and the appearance of fairness in the proceedings, *Press-Enterprise II*, 106 S. Ct. at 2743, fosters public confidence in the judicial process and acceptance of its results, *Press-Enterprise I*, 104 S. Ct. at 822, acts as a check on the judiciary, *Richmond Newspapers*, 100 S. Ct. at 2823, and allows the public to participate in government. *Id.* at 2833 (Brennan, J.,

concurring). Although members of the public may not attend judicial proceedings in large numbers, the news media acts as the public's surrogate in attending such proceedings and reporting to the public, thus educating the public. *Id.* at 2825.

Conversely, denying public access to judicial proceedings or documents precludes public scrutiny of the judicial process, creating an impression of unfairness and secrecy, even though the proceedings may in fact be imminently fair. *See* M. Fowler & D. Leit, *Media Access to the Courts: The Current Status of the Law* (American Bar Association, Section of Litigation 1995) at 1; *see also Soc'y of Prof'l Journalists v. Sec'y of Labor*, 616 F. Supp. 569, 576 (D. Utah 1985) (Winder, J.) ("Openness safeguards our democratic institutions. Secrecy breeds mistrust and abuse."), *appeal dismissed and remanded on other grounds*, 832 F.2d 1180 (10th Cir. 1987).

In assessing whether a constitutional right of access exists, the United States Supreme Court has "emphasized two complementary considerations," *Press-Enterprise II*, 478 U.S. at 8, in what has come to be known as the "experience and logic" test. First, the court considers "whether the place and process have historically been open to the press and general public." *Id.* Second, the court considers "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* If these considerations of experience and logic weigh in favor of public access, then a constitutional right of access exists that may be overcome only in the most exceptional circumstances.

Neither the United States Supreme Court nor the Tenth Circuit has yet addressed whether the *Press-Enterprise* constitutional right of access to proceedings also applies to court records. *See Colony Ins. v. Burke*, 698 F.3d 1222, 1241 n.27 (10th Cir. 2012). Although it is an open question for now, the Tenth Circuit has assumed that such a constitutional right exists when

4828-3156-2169                                8

analyzing questions of records access. *See*, *e.g.*, *United States v. McVeigh*, 119 F.3d 806, 811-12 (10th Cir. 1997). That approach is not surprising, since virtually every other Circuit, the courts of this District, and the state courts of Utah have all held that there is a First Amendment right of access to court records. *See, e.g., Globe Newspaper Co. v. Pokaski,* 868 F.2d 497, 502 (1st Cir. 1989) (there is a "First Amendment right of access to records submitted in connection with criminal proceedings"); *In re New York Times Co.,* 828 F.2d 110, 115 (2d Cir. 1987) ("a qualified First Amendment right of access extends to such documents"); *United States v. Smith,* 776 F.2d 1104, 1112 (3d Cir. 1985) ("no reason occurs to us why [the *Press-Enterprise II*] analysis does not apply as well to judicial documents"); *In re Washington Post. Co.,* 807 F.2d 383, 389 (4th Cir. 1986) ("the First Amendment right of access applies to documents filed in connection with [hearings]"); *Applications of Nat'l Broadcasting Co.,* 828 F.2d 340, 343 (6th Cir. 1987) (applying *Press-Enterprise II* test to hold that "there is a qualified right of access to documents and records that pertain to [the proceeding in question]"); *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984) ("this presumption is of constitutional magnitude"); *In re Search Warrant for Secretarial Area Outside Office of Gunn,* 855 F.2d 569, 573 (8th Cir. 1988) ("the first amendment right of access does extend to the documents filed in support of search warrant applications"); *Associated Press v. United States Dist. Ct.,* 705 F.2d 1143, 1145 (9th Cir. 1983) ("There is no reason to distinguish between pretrial proceedings and the documents filed in regard to them."); *United States v. El-Sayegh,* 131 F.3d 158, 160 (D.C. Cir. 1997) ("The First Amendment guarantees the press and the public access to aspects of court proceedings, including documents"); *Angilau v. United States*, No. 2:16-00992-JED, 2017 WL 5905536, at *7 (D. Utah Nov. 29, 2017) ("[T]here is a First Amendment right of access to the judicial documents at issue

here[.]"), *aff'd. on alternate grounds*, 2018 WL 1271894 (D. Utah Mar. 9, 2018); *Soc'y of Prof'l Journalists v. Briggs*, 675 F. Supp. 1308, 1310 (D. Utah 1987) ("This court agrees and holds that there is a constitutional right of access to public documents."); *State v. Archuleta*, 857 P.2d 234 (Utah 1993) (First Amendment right of access to court records filed in connection with preliminary hearing).

Both prongs of the *Press-Enterprise* test—experience and logic—apply with equal force to the public's right of access to judicial documents. With respect to experience, "[p]ublic access to court documents traces its roots back centuries through the common law, stemming from the practice of open trials." *Rosado v. Bridgeport Roman Catholic Diocesan Corp.,* 970 A.2d 656, 676 (Conn. 2009). "The existence of this right, which antedates the Constitution and which is applicable in both criminal and civil cases, is now 'beyond dispute.'" *Leucadia, Inc. v. Applied Extrusion Tech., Inc.,* 998 F.2d 157, 161 (3d Cir. 1993) (citation omitted). *See also Ex Parte Consol. Publ'g Co., Inc.,* 601 So.2d 423, *28-29 (Ala. 1992) ("judicial records and documents have historically been open to the press and public").

With respect to logic, "[t]he same considerations as to the positive role in the function of the process … apply to the court file." *Id.* at *30. "Public monitoring of the judicial process through open court proceedings and records enhances confidence in the judicial system by ensuring that justice is administered equitably and in accordance with established procedures." *Rosado,* 970 A.2d at 676. As the Utah Supreme Court articulated in *Archuleta,* this application of the constitutional right to judicial records recognizes the obvious importance of court records and their function in helping the public understand and scrutinize the judicial process. To draw a

distinction between records and hearings, particularly one of constitutional importance, defies common sense:

> We see no reason to distinguish between access to a preliminary hearing and the documents filed in related to that hearing.  As one scholar has noted, "***Access to pretrial documents furthers the same societal needs served by open trials and pretrial civil and criminal proceedings. . . .  The availability of documents means that graft and ignorance will be more difficult to conceal***."  Disclosing documents used by courts in reaching a decision in a preliminary hearing will discourage decisions based on improper means and will promote conscientious performance by all officials involved in the criminal justice system.  Therefore, providing a presumptive right of access to documents filed in connection with preliminary hearings can play a significant positive role in the functioning of that process.

*Archuleta*, 857 P.2d at 238-39 (citation omitted; ellipses in original; emphasis added).

In light of this virtual consensus, when the Tenth Circuit or the United States Supreme Court eventually address this issue, they almost certainly will conclude the same.  In any event, this Court would not be breaking any new ground in recognizing that constitutional right in this case.

In order to overcome the public's constitutional right of access, Genzyme bears a particularly heavy burden.  The right can be overcome only if Genzyme establishes a "substantial probability" that public access will endanger a compelling governmental interest, and that there are no less restrictive alternatives to blanket closure that will protect that interest.  *Press-Enterprise II*, 478 U.S. at 14.  This showing cannot be made by speculation or generalized assertions.  Rather, "It is only upon the showing of some ***specific circumstance*** that gives rise to ***significant probability*** of prejudice to the proceeding that the courts are inclined to close the courtroom and seal the records."  *People v. DeBeer*, 774 N.Y.S.2d 314, 315 (N.Y. Cty. Ct. 2004) (emphasis added); *see also State v. Cianci*, 496 A.2d 139, 145 (R.I. 1985) ("blanket statement of

potential prejudice was not sufficient to demonstrate compelling reasons for ordering the sealing of discovery documents").

### B. The Public Also Has a Common Law Right of Access to Court Records.

Even if this Court were to assume the constitutional right of access does not extend to documents, "[c]ourts have long recognized a common-law right of access to judicial records." *United States v. Pickard*, 733 F.3d 1297, 1302 (10th Cir. 2013) (quoting *Colony Ins.*, 698 F.3d at 1241). "'The right is an important aspect of the overriding concern with preserving the integrity of the law enforcement and judicial processes.'" *United States v. Apperson*, 642 F. App'x 892, 899 (10th Cir. 2016) (quoting *United States v. Hickey*, 767 F.2d 705, 708 (10th Cir. 1985)). "Although this 'right is not absolute,' there is a 'strong presumption in favor of public access.'" *Pickard*, 733 F.3d at 1302 (citations omitted).

This common law right of access is also embodied in the Rules of Practice of this Court, which affirm that "[t]he records of the court are presumptively open to the public," and that the "sealing of pleadings … or portions thereof … is highly discouraged." DUCivR 5-3(a)(1). Of particular significance to this case, the rule specifically provides that a "stipulation or blanket protective order that allows a party to designate documents as sealable will not suffice to allow the filing of Documents under seal." *Id.*

In deciding whether such rare circumstances exist to justify sealing the court file, this Court "must 'weigh the interests of the public, which are presumptively paramount, against those advanced by the parties.'" *Pickard*, 733 F.3d at 1302 (quoting *Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011)). "Consistent with this presumption that judicial records should be open to the public, the party seeking to keep records sealed bears the burden of justifying that secrecy[.]"

*Id.* It is only where the proponent of secrecy has "show[n] some significant interest" favoring closure that "'heavily outweigh[s] the public interests in access' to the judicial records" that sealing is warranted. *Id.* (citations omitted); *see also Angilau*, 2017 WL 5905536, at *5 ("Under the common law doctrine, judicial documents are presumptively open to the public, but may be closed or sealed if 'countervailing interests heavily outweigh the public interests in access.'" (citation omitted)). Thus, even though the common law right of access is somewhat less rigorous than the constitutional right, "[r]egardless of whether the right of access arises from the First Amendment or the common law, it may be abrogated only in *unusual circumstances*." *United States v. Morgan,* No. 5:06-cr-164-02, 2008 U.S. Dist. LEXIS 34949, *6 (S.D. W.Va. Apr. 28, 2008) (citation omitted).

## II. THE FOURTH AMENDED COMPLAINT SHOULD BE UNSEALED.

Given the broad and often conclusory assertions in Genzyme's briefing seeking to keep numerous documents, including the Fourth Amended Complaint, from public disclosure, it is hard to know what its actual argument is with regard to the particular allegations in the Complaint. But what is clear is that Genzyme cannot simply rely on the designations it unilaterally made in discovery under the Standard Protective Order. *See* DUCivR 5-3(a)(1). Once those discovery materials became part of a court filing—and not just any court filing, but the *operative pleading* in this case—they lost their status as mere discovery materials and became subject to the public's robust right of access. *See Shane Grp.*, 825 F.3d at 305. Nor can Genzyme simply assert that the allegations derive from "confidential business records." If that were enough for sealing, the vast majority of commercial disputes would be decided behind closed doors. The public's right of access demands more, as do the rules of this Court.

And while it is not the public's burden to justify why it seeks access to court records, the interests here in disclosure are substantial. That matters because "'the greater the public interest in the litigation's subject matter, the greater the showing necessary to overcome the presumption of access.'" *In re Nat'l Prescription Opioid Litig.*, 927 F.3d 919, 939 (6th Cir. 2019) (citation omitted). For most people in the United States suffering from Fabry disease, Fabrazyme is the only treatment standing between them and potentially fatal health consequences of their condition. Because of Genzyme's monopoly over that treatment, these patients have no other option than to rely on Genzyme's ability to continue to provide Fabrazyme in sufficient quantities and doses to prevent the adverse consequences alleged by Plaintiff in this case. It is of profound importance to those patients and their physicians specifically, and as a matter of public health generally, to learn of any evidence Genzyme may have, including statements or misstatements it may have made, concerning the effectiveness or safety of lower doses of Fabrazyme. That issue was central to this case, it is apparently central to the Fourth Amended Complaint, and it should be disclosed to the public.

Finally, even if this Court were to conclude, upon review of the sealed document, that Genzyme had made the necessary showing to overcome the strong presumption of public access with respect to some limited portion of the Fourth Amended Complaint, there is no justification for the entire document to remain under seal. This Court's rules now prohibit such blanket sealing, requiring the public filing of a redacted version. *See* DUCivR 5-3(b); *see also In re Nat'l Prescription Opioid Litig.*, 927 F.3d at 939 (any seal must be "narrowly tailored"). While STAT News does not believe any portion of the Fourth Amended Complaint should remain

under seal, should the Court disagree, STAT News requests that only those limited portions that satisfy the high constitutional bar be redacted, and the remainder released to the public.

## CONCLUSION

"People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers*, 448 U.S. at 572. For all of the foregoing reasons, the Fourth Amended Complaint should be unsealed.

RESPECTFULLY SUBMITTED this 22nd day of April 2020.

PARR BROWN GEE & LOVELESS, P.C.

/s/ David C. Reymann
David C. Reymann
Attorneys for Intervenor STAT News

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of April 2020, I electronically filed the foregoing **MOTION TO UNSEAL FOURTH AMENDED COMPLAINT (DKT. 173)** via the CM/ECF system, which served all counsel of record.

                                          /s/ David C. Reymann